UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CLARENCE OLIVER BEAN,

        Petitioner,                    Case Number: 05-70361

v.                                          HON. NANCY G. EDMUNDS

NICK LUDWICK,

        Respondent.
_____/

**OPINION AND ORDER DENYING
PETITION FOR WRIT OF HABEAS CORPUS**

Petitioner Clarence Oliver Bean has filed a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner, who is currently incarcerated at the Charles Egeler Reception and Guidance Center in Jackson, Michigan, challenges his conviction for second-degree murder. For the reasons set forth below, the Court finds that Petitioner is not entitled to habeas corpus relief.

**I. Facts**

Petitioner's conviction arises out of the murder of Diane Chorba. Ms. Chorba was last seen near her home located in Luther, Michigan, on May 24, 1979. Charges related to her disappearance were filed against Petitioner in 2001.

Petitioner's ex-wife, Judy Bean, testified that she married Petitioner in March 1968, and remained married to him for thirty-two years, until their divorce in 2000. Ms. Bean testified that during their entire marriage she was severely physically abused by

Petitioner. In November 1977, Ms. Bean became aware that her husband was having an affair with Ms. Chorba. Ms. Bean was aware that Ms. Chorba's then one-year-old son, Joshua, was Petitioner's child. Despite these circumstances, Ms. Bean and Ms. Chorba became close friends. The two women shared responsibility for caring for the children in the two households.

Ms. Bean testified that, in the winter of 1979, Ms. Chorba informed her that Ms. Chorba was again pregnant with Petitioner's child. Ms. Bean told Petitioner he should divorce her, marry Ms. Chorba and take care of the children. He replied that he would never let Ms. Bean go. Ms. Bean testified that, when the two argued about his relationship with Ms. Chorba, the arguments typically escalated to physical violence.

On the morning of May 24, 1979, at approximately 5:00 a.m., Petitioner informed Ms. Bean that he was going to Ms. Chorba's home. Approximately three-and-one-half hours later, Ms. Chorba drove Petitioner back to his home. Ms. Chorba waited in her vehicle while Petitioner brought Joshua into the home so that Ms. Bean could care for him. Ms. Bean testified that Petitioner returned several hours later. He was very upset. He informed Ms. Bean that he had killed Ms. Chorba and had come home for his chain saw.

After retrieving his chain saw, Petitioner drove Ms. Bean and Joshua into a heavily wooded area. They exited the vehicle, and Petitioner, who was carrying the chain saw, led Ms. Bean to an isolated area. Ms. Chorba's lifeless body was lying in a depression in the ground from which a very large tree had been uprooted. Petitioner cut the trunk of the

uprooted tree so that the roots and stump fell back into the depression in the soil, and atop Ms. Chorba's body. Petitioner informed Ms. Bean that he had shot Ms. Chorba because she had told him that if he did not divorce Ms. Bean and marry her she would leave and take the children with her.

Following Ms. Chorba's disappearance, Ms. Bean corroborated Petitioner's story to police that Ms. Chorba had been a passenger on an American Airlines flight that crashed in Chicago on May 25, 1979. Ms. Bean continued to corroborate his story until 1999. At that time, the Beans were living in Oregon. At the urging of Ms. Chorba's daughter, two Michigan state police detectives flew to Oregon to question Ms. Bean regarding Ms. Chorba's disappearance. Ms. Bean told the detectives about the events of May 24, 1979. Ms. Bean testified that she did not come forward earlier because she feared Petitioner.

Dr. Robert Kirschner, an expert in forensic pathology, testified that he was a medical examiner in the Cook County coroner's office in May 1979 and was responsible for identifying the victims of the American Airlines air crash. Dr. Kirschner testified that, using medical and dental records supplied by Ms. Chorba's family, he could determine to a medical certainty that Ms. Chorba was not one of the passengers of that doomed flight.

Petitioner did not testify in his own defense.

## II.  Procedural History

Following a jury trial in Lake County Circuit Court, Petitioner was convicted of second-degree murder.  On October 16, 2001, he was sentenced to thirty to sixty years imprisonment.

Petitioner filed an appeal of right in the Michigan Court of Appeals, presenting the following claim:

> Do confidential communications between a husband and wife made before October 1, 2000, the effective date of Act 182 PA 2000 which reversed the spousal privilege and communication privilege for testimony in criminal cases, require the consent of the individual for or against whom his or her spouse would testify, as was the law when the communications were made?

The Michigan Court of Appeals affirmed Petitioner's conviction.  People v. Bean, No. 237493 (Mich. Ct. App. June 12, 2003).

Petitioner filed a delayed application for leave to appeal in the Michigan Supreme Court, raising the same claim presented to the Michigan Court of Appeals.  The Michigan Supreme Court denied leave to appeal.  People v. Bean, No. 124320 (Mich. Jan. 29, 2004).

Petitioner then filed the pending petition for a writ of habeas corpus presenting the same claim presented on direct review in state court.

## III. Standard of Review

28 U.S.C. § 2254(d) imposes the following standard of review on federal courts reviewing applications for a writ of habeas corpus:

> An application for a writ of habeas corpus on behalf of a person in custody

4

> pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d). Therefore, federal courts are bound by a state court's adjudication of a petitioner's claims unless the state court's decision was contrary to or involved an unreasonable application of clearly established federal law. Franklin v. Francis, 144 F.3d 429 (6th Cir. 1998). Additionally, this court must presume the correctness of state court factual determinations. 28 U.S.C. § 2254(e)(1)[1]; *see also* Cremeans v. Chapleau, 62 F.3d 167, 169 (6th Cir. 1995) ("We give complete deference to state court findings unless they are clearly erroneous").

The United States Supreme Court has explained the proper application of the "contrary to" clause as follows:

> A state-court decision will certainly be contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases. . . .

---

[1] 28 U.S.C. § 2254(e)(1) provides, in pertinent part:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.

5

> A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from [the Court's] precedent.

Williams v. Taylor, 529 U.S. 362, 405-06 (2000).

With respect to the "unreasonable application" clause of § 2254(d)(1), the United States Supreme Court held that a federal court should analyze a claim for habeas corpus relief under the "unreasonable application" clause when "a state-court decision unreasonably applies the law of this Court to the facts of a prisoner's case." Id. at 409. The Court defined "unreasonable application" as follows:

> [A] federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable. . .
>
> [A]n unreasonable application of federal law is different from an incorrect application of federal law. . . . Under § 2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

Id. at 410-11.

With this standard in mind, the court proceeds to the merits of the petition for a writ of habeas corpus.

## IV.  Analysis

Petitioner presents a single claim for habeas corpus relief: that application of Michigan's amended marital-communications privilege law to his case violated the Constitution's *Ex Post Facto* Clause.  Prior to October 1, 2000, Michigan's marital-communications privilege, Mich. Comp. Laws § 600.2162, provided that a married person or a person that had been married previously could not be examined regarding any communications made between that person and his/her spouse or former spouse during the marriage.  In 2001, the statute was amended to permit testimony in a criminal prosecution regarding prior communications between spouses or former spouses with the consent of the person being examined.

In Calder v. Bull, 3 Dall. 386, 390, 1 L.Ed. 648 (1798), Justice Chase identified the following four categories of laws implicated by the *Ex Post Facto* Clause:

> 1st.  Every law that makes an action done before the passing of the law, and which was *innocent* when done, criminal; and punishes such action.  2d. Every law that *aggravates* a *crime*, or makes it *greater* than it was, when committed.  3d. Every law that *changes the punishment*, and inflicts a *greater punishment*, than the law annexed to the crime, when committed.  4th.  Every law that alters the *legal* rules of *evidence*, and receives less, or different, testimony, than the law required at the time of the commission of the offence, *in order to convict the offender*.

Calder, 3 Dall. at 390 (emphasis in original), quoted with approval in Carmell v. Texas, 529 U.S. 513, 522 (2000).

The fourth category of *ex post facto* protection is at issue in this case.  Petitioner argues that application of the amended statute to his case implicates that category of laws.

7

The Michigan Court of Appeals rejected Petitioner's argument, stating in pertinent part:

> Defendant argues that he was entitled to assert the marital communications privilege regarding any discussions that he allegedly had with his wife about the murder. In particular, defendant claims that the amendment should not have been applied retroactively because it does not contain retrospective language and such application violated federal and state ex post facto clauses, . . However, this Court in People v. Dolph-Hostetter, [256 Mich. App. 587 (Mich. Ct. App. 2003)], rejected both of these arguments.
>
> In Dolph-Hostetter, this Court considered whether the amendment to the marital communications privilege, M.C.L. 600.2162(7), violated the federal and state prohibition against ex post facto laws and held, in pertinent part:
>
>> Carmell [v. Texas, 529 U.S. 513 . . . ] and the longstanding precepts of the cases cited therein indicate, therefore, that the application of the amendment at issue in this case to marital communications occurring before October 1, 2000, does not violated the ex post facto clause of the United States Constitution. Moreover, because the ex post facto clause of the Michigan Constitution is "not interpreted more expansively than its federal counterpart," the retroactive application of the amendment does not violate the ex post facto clause of the Michigan Constitution. The amended statute only renders witnesses competent to testify, if they choose, or permits the admission of evidence that previously was inadmissible. It does not make criminal any prior action not criminal when done; it does not increase the degree, severity or nature of any crime committed before its passage; it does not increase the punishment for anything done before its adoption; and it does not lessen the amount or quantum of evidence that is necessary to obtain a conviction when the crime was committed. It does not fall within Justice Chase's fourth category of an ex post facto law that "alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offence [sic], in order to convict the offender," because it does not modify the evidence necessary to obtain a conviction. Id. [at 599].
>
> The Dolph-Hostetter Court also addressed the "defendant's argument that the amended marital communications privilege cannot operate retrospectively because the Legislature did not expressly indicate that it be

8

> given retrospective effect." . . . [T]his Court held, "[t]he marital communications privilege is invoked at the time of the pertinent court proceedings and thus is not 'vested' at an earlier date." Dolph-Hostetter, [256 Mich. App. at 602, n.7.]. Noting that the amendment became effective on October 1, 2000, the Court held that "[a]t court proceedings on or after that date, the amended statute controlled the admissibility of marital communication." [Id.]
>
> In sum, this Court has recently held that applying the amended marital communications privilege to communications made prior to the amendment does not violate federal and state ex post facto clauses. Id. Further, such amendment controls the admissibility of marital communications in court proceedings occurring on or after October 1, 2000. . . . We are bound by, and agree with, the Dolph-Hostetter opinion.

Bean, slip op. at 1-2.

The Supreme Court has held that "[s]tatutes which simply enlarge the class of persons who may be competent to testify in criminal cases" do not offend the *ex post facto* prohibition. Hopt v. Territory of Utah, 110 U.S. 574, 589 (1884); cited with approval Carmell v. Texas, 529 U.S. 513, 543 (2000). The Court reasoned that such statutes do not offend the *ex post facto* prohibition because:

> [T]hey do not attach criminality to any act previously done, and which was innocent when done; nor aggravate any crime theretofore committed; nor provide a greater punishment therefor than was prescribed at the time of its commission; nor do they alter the degree, or lessen the amount or measure, of the proof which was made necessary to conviction when the crime was committed.
>
> . . . Any statutory alteration of the legal rules of evidence which would authorize conviction upon less proof, in amount or degree, than was required when the offence was committed, might, in respect of that offence, be obnoxious to the constitutional inhibition upon *ex post facto* laws. But alterations which do not increase the punishment, nor change the ingredients of the offence or the ultimate facts necessary to establish guilt, but – leaving untouched the nature of the crime and the amount or degree of

> proof essential to conviction – only remove existing restrictions upon the competency of certain classes of persons as witnesses, relate to modes of procedure only, in which no one can be said to have a vested right, and which the State upon grounds of public policy, may regulate at pleasure. Such regulations of the mode in which the facts constituting guilty may be placed before the jury, can be made applicable to prosecutions or trials thereafter had, without reference to the date of the commission of the offence charged.

Hopt, 110 U.S. at 589-90.

In Carmell v. Texas, 529 U.S. 513 (2000), the Supreme Court observed that rules of evidence generally do not violate the *Ex Post Facto* Clause. "[S]uch rules, by simply permitting evidence to be admitted at trial, do not at all subvert the presumption of innocence, because they do not concern whether the admissible evidence is sufficient to overcome the presumption." Id. at 533, n.23.

In Carmell, the Supreme Court considered whether application of an amended Texas statute violated the *Ex Post Facto* Clause where the amended statute permitted conviction of certain sexual offenses based solely upon non-corroborated testimony of minor victims. Prior to the amendment, the testimony of minors over the age of thirteen could not support a conviction unless the testimony was corroborated or the victim had informed another person within six months of the offense. In Carmell, the petitioner had been convicted of fifteen counts of criminal sexual conduct. The petitioner contested four of those convictions because the acts were committed prior to the amendment's enactment, when the victim was a minor over the age of thirteen, and were based upon her uncorroborated testimony. The Court held that the statute could not be applied to

10

crimes committed before its enactment because it was a law that "alter[ed] the legal rules of evidence, and receives less, or different, testimony than the law required at the time of the commission of the offence, in order to convict the offender." Id. at 530. Under the law in effect at the time the acts were committed, the petitioner was entitled to a judgment of acquittal because the prosecutor produced only the victim's testimony. The amended law, thus, "changed the quantum of evidence necessary to sustain a conviction." Id. "Requiring only the victim's testimony to convict, rather than the victim's testimony plus other corroborating evidence is surely less testimony required to convict." Id. The amended statute, therefore, rendered what had been legally insufficient evidence to support the conviction, legally sufficient.

The amendment to Michigan's spousal privilege law does not change the quantum of evidence necessary to sustain a conviction. In contrast to the amendment at issue in Carmell, Michigan's amendment does not "authorize a conviction on less evidence than previously required." Id. at 531. It simply alters the class of persons eligible to testify. As such, its application to Petitioner's case did not violate the *Ex Post Facto* Clause. *Accord* Palmer v. Clarke, 408 F.3d 423 (8th Cir. 2005) (holding that Nebraska's marital privilege law allowing defendant's wife to testify at re-trial did not violate *Ex Post Facto* Clause because it did not change the legal sufficiency of the evidence standard); Muscio v. New Jersey, 2005 WL 2600256 (D. N.J. Oct. 13, 2005) (holding that amendment of marital communication privilege, between petitioner's first and second trial, to permit disclosure of marital communication when either spouse consents to disclosure was not

an *ex post facto* violation because changes in witness competency statutes do not run afoul of the *Ex Post Facto* Clause).

## V. Conclusion

The Michigan Court of Appeals' disposition of Petitioner's *ex post facto* claim was not contrary to or an unreasonable application of clearly established Federal law. Accordingly, **IT IS ORDERED** that the petition for a writ of habeas corpus is **DENIED** and the matter is **DISMISSED WITH PREJUDICE**.


s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated: December 8, 2005

I hereby certify that a copy of the foregoing document was served upon counsel of record on December 8, 2005, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager